IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STACY WEISCHEDEL,<br><br>Defendant. | CR 98–21–M–DWM<br><br><br><br>ORDER |

On June 12, 2025, Defendant Stacy Weischedel filed a motion under 18 U.S.C. § 3582(c)(1)(A) to reduce her three life sentences for armed carjacking and kidnapping, which culminated in the murder of Peter Stucky. (Doc. 121). The government opposes. (Doc. 127.) Weischedel's motion is granted in part as outlined below.

Following Weischedel and her codefendant husband's crime spree through Washington, Idaho, and Montana, the United States Department of Justice, these three states, and defense counsel agreed in a Memorandum of Understanding, that, *inter alia*, a single federal prosecution of Weischedel would be brought by the federal government in the District in Montana and that the death penalty would not be sought (the "Memorandum of Understanding"). (PSR ¶ 13.) Consistently, on May 7, 1998, Weischedel was charged in the District of Montana with the

1

following six offenses: conspiracy to commit kidnapping in violation of 18 U.S.C.

§ 1201(c) (Count I); kidnapping in violation of 18 U.S.C. § 1201(a)(1) (Count II);

motor vehicle theft – carjacking in violation of 18 U.S.C. §§ 2119(3), 2 (Count

III); interference with commerce by threat or violence in violation of 18 U.S.C.

§§ 1951, 2 (Count IV); use of a firearm in a crime of violence in violation of 18

U.S.C. §§ 924(c)(1), (j)(1) (Count V); and transportation of a stolen vehicle in

violation of 18 U.S.C. §§ 2312, 2 (Count VI).  (Doc. 4 (Indict.).)  She pled guilty to

all six counts, and was sentenced to concurrent terms of life on Counts I, II, and

III; a concurrent term of 20 years on Count IV; a concurrent term of 10 years on

Count VI; and a consecutive term of 20 years on Count V.  (Doc. 79 (Judg.).)

Weischedel was ordered to pay restitution in the amount of $501,247.90.  (*Id.*)

Weischedel's request for a sentence reduction presents a conundrum

concerning the meaning of "justice."  On the one hand, the family of Weischedel's

victim adamantly and vigorously oppose any reduction to her sentence, with good

reason.  The United States is also opposed to any reduction of sentence, and

justifiably so.  Indeed, the facts underlying Weischedel's conviction constitute a

deliberate, mindless plan to assassinate an automobile salesman.  Weischedel and

her husband went on a drug-induced rampage, committing violent crimes in

Washington, Idaho, and Montana.  (PSR ¶¶ 14–21.)  She, along with her husband,

was ultimately captured and subsequently charged with multiple crimes in both

federal and state courts. (*See* Doc. 4.) Weischedel was confronted with a potential

death sentence in the states of Idaho and Montana, and possibly Washington, and

she faced a possible death sentence or life in prison in the Montana federal case.

(*See* PSR ¶¶ 11–13.) In the Memorandum of Understanding, the United States

agreed to forego the death penalty in exchange for a jointly recommended sentence

of life without the possibility of parole. (PSR ¶ 11.) The states of Washington,

Idaho, and Montana agreed to forgo prosecution seeking the death penalty if the

Memorandum of Understanding resulted in sentences that could not, and would

not, be alleviated. (PSR ¶ 12.) At that time, the victim's family was consulted and

agreed to the sentence of life without the possibility of early release. The family

vociferously objects to Weischedel's current effort seeking compassionate release,

reasonably arguing that she is backtracking on the provisions of the deal she agreed

to, an agreement that potentially saved her life. (Docs. 132-1, 132-2, 132-3.)

On the other hand, Weischedel invokes a change in the federal sentencing

law, as reflected in the First Step Act of 2018 and United States Sentencing

Guidelines §1B1.13(b)(4)(A), as grounds for her relief because she was repeatedly

subjected to sexual abuse during her imprisonment. Weischedel was incarcerated

in California at the Federal Correction Institute Dublin ("Dublin"). While there,

Weischedel alleges that she was subjected to sexual and other abuses by Bureau of

Prisons officials. (Doc. 122 at 12-14.) The Dublin facility was closed as a

3

consequence of the abuse women prisoners were subjected to, and Weischedel was

transferred to a different Bureau of Prisons facility. (Doc. 122-3 at ¶¶ 29-32.) And

Weischedel alleges that she suffered more abuse while in transit. (Doc. 122 at 14-

16.) Additionally, despite that inexcusable abuse, Weischedel's prison record

shows that she has had no serious incidents while incarcerated, successfully

engaged in programing in multiple areas, and presents no threat to the public. (*See*

Doc. 122-19 at 7.)

Thus, resolving the present motion requires weighing Weischedel's conduct

against the events that have occurred since her sentencing. But that is not all.

There are also my own comments made at that sentencing hearing. At

Weischedel's sentencing, I repeatedly said it was my intent that, given the nature

of the offenses, she should spend the balance of her life in prison. It is worth

noting that when she pled guilty, Weischedel was advised she was facing life on

Count I, death or life on Count II, life on Count III, and up to twenty years on

Count IV, five years to life on Count V, and up to ten years on Count VI. (*See*

Doc. 31; Doc. 77 at 40.) At the time her life sentences were imposed, the Court

specifically expressed that Weischedel would never be outside of prison walls:

"The sentence I am imposing, I intend to be literally a life sentence, that you never

ever are released from prison." (Sentencing Tr. 153:12–14).

Deciding what is "just" in these circumstances is truly a conundrum. Of

4

primary concern is that Weischedel asks this Court to disregard her prior agreement and her understanding that she was to spend the rest of her life in prison *in order to avoid the death penalty*. But, as federal sentencing has evolved, the question is more complicated. There is no question Weischedel has conformed her behavior in prison to what is expected of her, abiding by the rules and protocols of the institutions. She is correct in her assertion that employees and agents of the Bureau of Prisons horribly abused her and other incarcerated individuals in violation of the law. But those post-sentencing developments do nothing to alleviate the reality that her crime requires punishment and that her sentence must reflect the considerations identified in the congressionally mandated factors outlined in 18 U.S.C. § 3553(a). As a result, the question becomes a measure of balance between the multiple horrid crimes she committed and those that were committed against her.

Analysis of Weischedel's claim begins with determining if extraordinary and compelling reasons support a reduction. If so, then the Court must determine if a reduction would be consistent with policy statements issued by the Sentencing Commission. Finally, there is the necessity to reconsider the factors of 18 U.S.C. § 3553(a). For the reasons explained forth below, Weischedel's motion is granted to the limited extent outlined below.

## BACKGROUND

### I. Offense Conduct

On April 12, 1998, Weischedel and her husband, Walter Eric Weischedel ("Eric Weischedel"), began an interstate crime spree by stealing a motorhome belonging to Eric Weischedel's aunt and uncle. (PSR ¶ 14.) The two traveled in the motorhome from Marcola, Oregon to Lewiston, Idaho. (PSR ¶ 14.) Before arriving in Lewiston, the Weischedels discussed a plan to steal a vehicle. (PSR ¶ 15.) The plan involved kidnapping a salesman during a test drive, restraining the salesman, and then shooting him. (PSR ¶ 15.)

Once in Lewiston, the Weischedels made their way to an auto dealership. Although they did not have the money to purchase it, the Weischedels convinced salesman Peter Stucky to allow them to test drive a 1999 Ford F350 pickup truck. (PSR ¶ 16.) At the time, Eric Weischedel had a .22 caliber Smith and Wesson semi-automatic handgun concealed on his person. (PSR ¶ 16.) To begin the test drive, the three entered the vehicle, with Stucky driving, Stacey Weischedel in the front passenger seat, and Eric Weischedel in the rear passenger seat. (PSR ¶ 17).

Shortly thereafter, Stucky changed places with Stacey Weischedel, so that she could drive. (PSR ¶ 17.) As a result, Stucky was seated directly in front of Eric Weischedel as the three travelled away from Lewiston, Idaho towards Washington. (PSR ¶ 17.) At a pull-out, Stacey Weischedel began to turn the

vehicle around.  (PSR ¶ 17.)  As planned, Eric then shot Stucky in the back of the head.  (PSR ¶ 17.)  To keep Stucky upright, Eric Weischedel supported his unconscious body by the shoulders.  (PSR ¶ 17.)  Within a few minutes, Stacey Weischedel had driven the truck into Washington.  (PSR ¶ 17.)  After stopping, the Weischedels removed Stucky for the front seat, placed his unconscious body face-down on floor of the truck in the back seat, and covered him with coats to conceal him from view.  (PSR ¶ 17.)  Eric Weischedel took Stucky's wallet from his person and pilfered his cash and credit cards.  (PSR ¶ 17.)

The Weischedels then drove the stolen truck through Washington, Idaho, and Montana.  (PSR ¶¶ 18, 19.)  At several stops they made purchases using cash and credit cards taken from Stucky's wallet.  (PSR ¶ 18.)  In Montana, the two then turned north on Highway 93.  (PSR ¶ 19.)  Near Evaro, Montana, they left the highway.  (PSR ¶ 19.)  Finding a secluded location, they removed Stucky's body from the truck and left it in the woods.  (PSR ¶ 19.)  The Weischedels then drove to Missoula, Montana, and failed in their attempt to use Stucky's credit cards at Walmart.  (PSR ¶ 20)  That evening they stayed in a motel in Drummond, Montana.  (PSR ¶ 20.)

After the Weischedels left Drummond the next day, a Montana Highway Patrol officer identified the stolen truck, then driven by Eric Weischedel.  (PSR ¶ 21.)  During attempts to pull over the Weischedels, the truck rammed the

7

officer's patrol vehicle.  (PSR ¶ 21.)  The Weischedels then led law enforcement on a high-speed chase.  (PSR ¶ 21.)  The Weishchedels fled along Highway 1, through the town of Anaconda, Montana, at speeds estimated at 90 to 100 miles per hour.  (PSR ¶ 21.)  West of Anaconda, the truck travelled in the middle of the street, running at least two other vehicles off the road.  (PSR ¶ 21.)  The pair then left the main road.  (PSR ¶ 21.)  When the truck became stuck, the two fled on foot to a ranch where they hid in a haystack.  (PSR ¶ 21.)  On April 20, 1998, the Weischedels were arrested after being found by law enforcement in that haystack. (PSR ¶ 23.)

## II.  Guilty Plea

On June 17, 1998, Weischedel entered a plea of guilty to all charges in the Indictment.  (Doc. 31.)  Weischedel entered her guilty plea without a plea agreement.  (*See id.*)  However, before Weischedel's plea, the government submitted a Memorandum of Understanding, which states:

> The purpose of this document is to memorialize the principle understandings and agreements reached between the United States of America and the sovereign states of Idaho, Washington, and Montana and Stacy L. Weischedel concerning the taking of the Ford Pickup truck and the death of Peter L. Stucky during the taking of the Ford Pickup truck.
>
> The United States and the sovereign states named above have agreed that in exchange for Stacy L. Weischedel's voluntary confession concerning the events involving the Ford Pickup truck and Mr. Stucky, Stacy L. Weischedel and her spouse, Walter Eric Weischedel will be prosecuted in a single case brought in Federal Court in the District of

Montana, Helena Division. Furthermore, in exchange for Stacy L. Weischedel's cooperation, to include, but not limited to, her disclosure of the location of Mr. Stucky's body, the United States will forego and not seek the death penalty in the single federal prosecution to be brought by the United States in the District of Montana, Helena Division, as recited above. This Memorandum of Understanding pertains only to acts which preceded and followed the death of Mr. Stucky and not to any other capital crime yet unknown to the United States. Finally, the United States, the sovereign states listed above, and Stacy L. Weischedel agree that the resulting sentence in Stacy L. Weischedel's prosecution is expected to be, and will be, a life sentence without the possibility of parole.

This Memorandum of Understanding anticipates that any charges that have been brought against Stacy L. Weischedel in any state court will be dismissed with prejudice in favor of the single federal prosecution in the District of Montana, Helena Division. In this connection the United States through United States Attorney Sherry Scheel Matteucci represents that she, through her assistant Bernard F. Hubley, has been advised that each of the sovereign states, to wit: Idaho, Washington and Montana are in agreement with the principles set forth in this Memorandum of Understanding. And in particular the United States represents that it has been authorized by each of the above described sovereigns to assure Stacy L. Weischedel that she will not be prosecuted in any state court for any capital offense connected with the taking of the Ford Pickup truck and Mr. Stucky's death.

(PSR ¶ 13).

## III.    Incarceration at Dublin

In September of 2000, Weischedel was transferred to Dublin from another federal facility. (Doc. 122-3 at ¶ 12.) The systemic issues plaguing Dublin are well known and the mistreatment, abuse, and rape of female inmates by Bureau of Prison officials at Dublin is well documented. *See, e.g., Cal. Coal. for Women Prisoners v. U.S.*, 723 F. Supp. 3d 712, 734 (N.D. Cal. 2024) ("There can be no

question that the sexual abuse that many incarcerated persons suffered at FCI Dublin was objectively horrific."). Multiple former staffers have been criminally convicted for their actions. *See Id.* In response to the conditions and ongoing abuses at Dublin, the United States District Court for the Northern District of California appointed a special master to oversee the facility in April 2024. *Id.* at 748. Soon after, the Bureau of Prisons elected to close Dublin entirely. (*See* Doc 7; 122-8); *see also U.S. v. Russell*, 757 F. Supp. 3d 1132, 1136 (D. Idaho 2024) (outlining the facts surrounding Dublin's closure and the related litigation). Weischedel and the other inmates incarcerated at Dublin were then transferred to other Bureau of Prisons facilities. (Doc. 122-3 at 4.) Weischedel is now incarcerated at Federal Correctional Institute Danbury. (Doc. 122-3 at ¶ 35.)

Weischedel asserts that she suffered significant and particularized abuse while incarcerated. During her time at Dublin, Weischedel was employed at UNICOR. (Doc. 122 at 12). Weischedel alleges that she was abused by Richard Larson "the IT specialist at UNICOR" who "often acted as a substitute factory manager." (*Id.*) Weischedel details an escalating patter of "grooming" and abuse on the part of Larson. According to Weischedel, Larson's abusive conduct started with images on his computer. At first, Larson would show Weischedel "images of mountains and beaches." (*Id.*) However, Larson began interspersing the otherwise inoffensive pictures with pornographic images. This conduct was reported by

10

another inmate, but no corrective action occurred. (*Id.*) Within a few months, Larson's conduct began to escalate. Soon after, Larson began "brushing his body against [Weischedel]" and "pinching her butt cheeks." (*Id.*)

Weischedel explains that Larson's conduct continued to escalate and that he began providing her with underwear and instructions that she should wear and then return them to him. (Doc. 122 at 13.) In one instance, Weischedel indicates that Larson wore a pair of underwear that Weischedel had returned to him, and informed Weischedel that his wife had worn the same underwear the day before Larson gave them to Weischedel. (*Id.*) Another time, Weischedel states that on Larson's instructions she wore a pair of underwear that he had ejaculated into. (*Id.*). Finally, Weischedel describes one instance where Larson ordered her to stimulate his erection over his pants and that she complied with the order. (*Id.*)

Weischedel's briefing and affidavit also include detailed allegations of mistreatment during her transfer from Dublin to West Virginia, where she was held at Secure Female Facility Hazelton. (Doc. 122 at 14; Doc. 122-3 ¶ 32.)

### ANALYSIS

The First Step Act of 2018 gives district courts wide discretion to reduce an existing term of imprisonment so long as a defendant first seeks relief from the Bureau of Prisons ("BOP") and the reduction: (1) is consistent with the applicable policy statements of the Sentencing Commission, (2) takes into consideration the

11

sentencing factors of 18 U.S.C. § 3553(a), and (3) is warranted by "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A); *United States v. Keller*, 2 F.4th 1278, 1284 (9th Cir. 2021) (per curiam).

Here, Weischedel's argument for compassionate release is twofold. First, Weischedel argues that extraordinary and compelling reasons justifying a reduction in her sentence exist given the abuse she experienced while incarcerated, including the sexual abuse suffered at Dublin. Second, she argues that non-retroactive changes to the United States Sentencing Commission Guidelines in combination with her conduct and rehabilitation while incarcerated merit a reduced sentence.

Whether good behavior in prison coupled with criminal abuse by the federal government acting through the Bureau of Prison is tantamount to extraordinary conditions is answered by the amendments to the Sentencing Guidelines. The Guidelines now explicitly recognize that sexual abuse at the hands of the Bureau of Prisons correctional officers or employees is an extraordinary and compelling reason for sentence modification. USSG §1B1.13(b)(4)(A). As explained below, there is a compelling reason to reduce Weischedel's life sentences to a significant term of years followed by the statutory maximum period of supervised release. Nonetheless a reduction must also be consistent with the sentencing factors under 18 U.S.C. § 3553(a). Consideration of Weischedel's motion is more difficult at this second step.

12

## I.    Exhaustion of Administrative Remedies

A defendant may only file a motion for compassionate release with the district court once the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Here, Weischedel filed a request for relief with the warden on October 22, 2024. (Doc. 122-12.) That request was denied on December 2, 2024. (*Id.*) She has therefore exhausted her administrative remedies as required by statute.

## II.    Extraordinary and Compelling Reasons

While the First Step Act does not define "extraordinary and compelling reasons," the Sentencing Commission provides explicit examples of what constitutes such reasons, including being a "victim of abuse . . . while in custody serving the term of imprisonment sought to be reduced" that was "committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant." USSG §1B1.13(b)(4). This abuse can be either sexual or physical. §1B1.13(b)(4)(A), (B). The Guidelines explain that "sexual abuse involve[es] a 'sexual act,' as defined in 18 U.S.C. § 2246(2) . . .[,] including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim."

13

§1B1.13(b)(4)(A). The Guidelines require that "the misconduct . . . be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding." This requirement applies "unless such proceedings are unduly delayed or the defendant is in imminent danger." §1B1.13(b)(4). The Commission also includes a catch-all example of extraordinary and compelling circumstances where a "defendant presents any other circumstances or combination of circumstances that, when considered themselves or together with any" other examples "are similar in gravity" to the enumerated reasons. §1B1.13(b)(5).

Under the catch-all example, Weischedel argues that a combination of three circumstances warrants her release. Specifically, Weischedel points to (1) the alleged sexual abuse committed by a Bureau of Prisons official, (2) her confinement at Dublin, and (3) her experience being transferred from Dublin to another facility. The government does not address Weischedel's arguments regarding extraordinary and compelling circumstances. (*See* Doc. 127 at 12.) Based on the record in this case, Weischedel's experiences constitute extraordinary and compelling reasons sufficient to satisfy the requirements of §1B1.13(b)(5). Although the experiences connected to her transport might also support a finding of extraordinary and compelling reasons, Weischedel's allegations regarding her treatment at Dublin are independently sufficient to satisfy §1B1.13(b)(5).

14

Weischedel was incarcerated at Dublin for almost 25 years.  (Doc. 122-3 at

¶ 29.)  The conditions endured by inmates at Dublin due to the significant and

ongoing failures by the Bureau of Prisons are well documented.  *See United States*

*v. Castellanos*, 2024 WL 4504523, at *3 (D. Mont. Oct. 16, 2024) ("The Court

acknowledges that FCI Dublin inflicted serious harm on inmates, which resulted in

the historic closure of the facility.").  The chief issue identified while Dublin was

still in operation was the pervasive and well-documented "culture of harassment

and abuse."  *United States v. Lambert*, 2025 WL 2735856, at *3 (D. Mont. Sept.

24, 2025).  However, despite its serious and ongoing nature, Weischedel

acknowledges that the abuse she alleges to have suffered at Dublin does not satisfy

the letter of §1B1.13(b)(4) because Larson's alleged conduct does not include any

of acts specifically enumerated in 18 U.S.C. § 2246(2).  Thus, Weischedel argues

for a finding of extraordinary and compelling circumstances under §1B1.13(b)(5).

As alleged, Weischedel's mistreatment and abuse by Larson, a Bureau of

Prisons official, establishes circumstances as grave as the conduct that would meet

the letter of §1B1.13(b)(4).  Larson's alleged conduct was significant, ongoing, and

criminal.  The gravity of that alleged conduct is all the more significant in light of

its impact on Weischedel, who was already a survivor of rape and sexual abuse

prior to her incarceration.  (*See* PSR ¶¶ 82–83.)

Although not addressed by the government, Weischedel's specific

allegations of abuse at Dublin remain officially unconfirmed.  However, in light of

the circumstances of her case, Weischedel has nevertheless presented sufficient

information to establish extraordinary and compelling reasons related to her

mistreatment at Dublin.  Unlike §1B1.13(b)(4), §1B1.13(b)(5) includes no

requirement that misconduct underlying extraordinary and compelling

circumstances be established in a court or administrative proceeding.  And even

where defendants seeking compassionate release have framed their arguments

under the more stringent requirements of §1B1.13(b)(4), courts have found the

undue delay exception applicable.

    For example, in *United States v. Russell*, the District of Idaho considered the

defendant's allegations in light of both the "dysfunctional mess" at Dublin and the

fact that, by the time the Court considered defendant's arguments, Dublin had

closed.  757 F. Supp. 3d 1140 (D. Idaho 2024).  The court concluded that "it is

difficult *not* to find there has been a significant delay in the administrative

proceeding" and "[a]t a minimum[,] . . . this lack of administrative review c[ould]

not be held against" the defendant.  *Id.*  The court therefore did not require that the

misconduct on the part of prison staff be determined by formal proceedings.  *Id.*;

*see also United States v. Lambert*, 2025 WL 2735856, at *2, *5 (D. Mont. Sept. 24,

2025) (finding "at least some undue delay in proceedings" based on the chronic

abuse and constitutional violations at Dublin before its closure and the post-closure

16

challenges to inmates seeking relief).

Here, as Weischedel points out, Larson's alleged mistreatment and abuse did not go unreported. Weischedel's affidavit states that, after Larson shared pornographic images with Weischedel and others, a fellow inmate reported that behavior to a supervisor. (Doc. 122 at 12.) Weischedel further explains that she "reported Larson's abuse to the Office of the Inspector General" and that she was interviewed by an Assistant United States Attorney for the Northern District of California and a Special Agent with the Office of the Inspector General regarding her mistreatment at Dublin. (*Id.* at 20.)

While these actions and conversations do not amount to formal findings in a court or administrative proceeding, they do "lend some credibility" to Weischedel's allegations. *See Lambert*, 2025 WL 2735856, at *5. In addition, the same difficulty with substantiating allegations of abuse at the now-closed Dublin, as noted in *Lambert* and *Russell*, support a finding of "at least some undue delay in proceedings." *Id.* at *5; *Russell*, 757 F. Supp. 3d at 1140. Considering the credibility of Weischedel's allegations, the administrative delay associated with Dublin, and the government's lack of argument to the contrary, Weischedel has demonstrated mistreatment of similar gravity to conduct described in §1B1.13(b)(4). *See* §1B1.13(b)(5). Accordingly, Weischedel has established extraordinary and compelling reasons warranting a sentence reduction.

17

## III.    Section 3553(a) Factors

As noted, if an extraordinary and compelling reason exists, it is nonetheless an obligation of the Court to further inquire about specific statutory sentencing requirements and determine whether they conflict with the initial finding of a compelling reason to consider sentence reduction or release.  Any reduction must also be consistent with the sentencing factors under 18 U.S.C. § 3553(a).  The government argues that consideration of the § 3553(a) factors strongly disfavors early release.  Although it is a close question, the government is incorrect.

Pertinent factors under § 3553(a) include the "nature and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," to deter criminal conduct and protect the public, and to provide effective correctional treatment, including education or vocational training and medical care.  18 U.S.C. § 3553(a)(1), (2).  Courts may also consider the advisory guideline range and the need to "avoid unwarranted sentencing disparities" among similarly situated defendants.  *See id.* § 3553(a)(4), (6).  Taken together, these factors support a sentence reduction here.

### a.    Nature of the Offense

The crimes to which Weischedel admitted guilt in 1998 are shocking and egregious.  In essence, they are so egregious that the government argues that

18

nothing that has occurred since Weischedel's sentencing merits compassionate release or a reduction in her term of imprisonment. For her part, Weischedel does not minimize the significance of her wrongdoing. Instead, she argues that the remaining factors are sufficient to outweigh the nature of the offense. In support, Weischedel points to cases from across the country where defendants who committed similarly significant crimes were granted reduced sentences. Because a sentence reduction under § 3582 is ultimately an individualized determination, the relevant question is whether the other § 3553(a) factors weigh strongly enough in Weischedel's favor to support a reduced sentence. Answering that question requires consideration, once again, of the specific horrifying facts of Weischedel's underlying conduct. Weischedel and her husband planned to kill Stucky by luring him to the front passenger seat while they ostensibly test drove a vehicle. (PSR ¶¶ 15, 28–31.) According to plan, when she was told to return to the dealership, her husband shot Stucky in the back of the head. (PSR ¶¶ 15–17.) But he did not die instantly. (PSR ¶ 17.) Weischedel and her husband did not render aid, nor did they seek help in any manner for him. (PSR ¶ 17.) Instead, they stopped long enough to dump his unconscious body on the backseat floor of the pickup while they continued their joy ride through multiple states. (PSR ¶¶ 17, 26.) And even after dumping his body in a remote Montana area, they used Stucky's credit cards to make purchases. (PSR ¶¶ 17–18, 33.) They ended up attempting to evade law

19

enforcement and engaged in a dangerous high-speed car chase to evade capture.
(PSR ¶ 21.)  This entire horrid affair lasted multiple days in multiple states at great
risk to themselves, to law enforcement and to the public.  Weischedel participated
in calculated cold-blooded murder.  As argued by the government, this factor does
not support a reduction in her sentences.

> b.    **History and Characteristics of the Defendant**

The Presentence Investigation Report and the testimony at sentencing reveal
that Weischedel endured a tragic upbringing.  She was abused by her family and
otherwise.  (*See* PSR ¶¶ 74, 82–83.)  She married quite young and gave birth to a
son and she readily got mixed up in a bad crowd, including her relationship with
Eric Weischedel who had recently been released from prison.   (PSR ¶¶ 70–73.)
He took advantage of her vulnerabilities and hooked her on illegal drugs.  (PSR
¶¶ 73–77.)

While these circumstances were considered at the time she was sentenced
and were ultimately found wanting when balanced against the atrocity of her
criminal conduct, that calculus has now changed.  Having been involved in
depriving defendants of liberty for nearly thirty years, it is clear that childhood
trauma often leads to criminal conduct, though it does not excuse it.  Here, when
held accountable for her criminal acts, the Bureau of Prisons and the United States
government had an obligation to carry out the Court's sentence and to comply with

the law, which it failed to do as to Weischedel, and failed in a gross criminal .
fashion.  With the addition of §1B1.13(b)(4) to the Guidelines, this combination
gives life to her motion.

Weischedel also argues that the record of her two decades of incarceration
shows thorough and meaningful rehabilitation.  The Sentencing Guidelines explain
that "rehabilitation of the defendant is not, by itself, an extraordinary and
compelling reason for purposes of this policy statement."  §1B1.13(d).  However,
"rehabilitation of the defendant . . . may be considered in combination with other
circumstances in determining whether and to what extent a reduction in the
defendant's term of imprisonment is warranted."  §1B1.13(d).

Here, Weischedel emphasizes her psychological treatment, a lengthy
employment history, and completion of over 130 courses offered by the Bureau of
Prisons.  (Doc. 122 at 30–32.)  Weischedel also references her meaningful
relationships with other prisoners, her family, and others.  (*Id.* at 32–33.)
Weischedel also argues that she endured significant trauma prior to committing her
crimes.  (*Id.* at 27.)  This includes sexual abuse and rape as a child, the death of a
parental figure, and the stillbirth of her first child.  (*Id.* at 27–28.)  According to a
psychological evaluation attached to her briefing, the abuse that Weischedel
endured at Dublin was particularly traumatizing, given the trauma she endured in
her young life.  (Doc. 122-10 at ¶ 52.)

The government is not directly critical of any of Weischedel's post-conviction conduct. Rather, the government's primary argument is that she improperly relies on *United States v. Lebaron*, 2023 WL 7308116 (S.D. Tex. Nov. 6, 2023), to argue her rehabilitation is sufficient to reduce her sentence. According to the government, Weischedel's reliance on *Lebaron* is inappropriate because the facts of Weischedel's case differ significantly from those in *Lebaron*. The government's argument is not persuasive. Although *Lebaron* is only instructive when considering Weischedel's motion and the facts do differ, nothing in the government's briefing actually undermines Weischedel's rehabilitative efforts.

Accordingly, this factor supports a sentence reduction.

### c.    Seriousness of the Offense, Respect for the Law, Just Punishment

The final factors weighing on Weischedel's sentence address the need for the sentence imposed

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Weischedel argues that reducing her sentence to thirty years followed by supervised release would "still reflect the seriousness of her

22

crime, promote respect for the law, and provide just punishment, and deter crime."
(Doc. 122 at 29.)  Weischedel argues that given her rehabilitation and history as
inmate she is not a threat to the public.  She also points to the deterrent effect of the
decades she spent incarcerated at Dublin.

In response, the government does not contest Weischedel's appraisal of
factor (B), adequate deterrence, and factor (C), protection of the public.  Thus,
there is little to be said about these factors, or factor (D), the provision of effective
treatment.  If these were the sole considerations, a reduction in sentence would
certainly be warranted.  Weischedel presents no risk of engaging in similar or
violent criminal conduct, and her time in prison has been productive of self-
betterment as is evident in the documentation in this case.  Furthermore, one of the
goals of the criminal justice laws is to alter an individual's conduct to a meaningful
degree so that the individual poses no threat to the community or to society.
Weischedel presents no risk of engaging in similar or violent criminal conduct.

Pursuant to § 3553(a)(2)(A), the remaining issue is whether a reduced
sentence could appropriately "reflect the seriousness of the offense," "promote
respect for the law," and "provide just punishment."  To that end, the government
argues that, as reflected at Weischedel's original sentencing, only life
imprisonment can accomplish those goals.  In response, Weischedel cites to
national statistics, arguing that her sentence is longer than average for federal

23

murder sentences. (Doc. 131 at 12.) But just like her motion for compassionate release, Weischedel's original sentence was based on the unique facts of this case. National statistics may offer some insight, but ultimately this case requires an individualized determination.

Unquestionably, Weischedel has learned to respect the law, as difficult as that has been given the failings of the Bureau of Prisons at Dublin. However, murder is as heinous a crime as exists in the panoply of harm to others. So is rape. What is the balance between those acts and just punishment?

Much of that balance is answered by the life-saving agreement Weischedel entered with the federal government that lessoned the law's wrath: the death penalty was taken off the table with an agreement that she would spend the balance of her life in an institution. The life sentences imposed here may seem harsh given Weischedel's life experiences before and following sentencing, but even so, these sentences according to the evolving area of compassionate release law are to be tempered with the need for justice under the facts presented here. The conundrum here is to what extent does Weischedel's criminal sexual abuse at the hands of the government, which has convicted her and taken her liberty, mitigate the consequences of a premeditated homicide? The answer is not an easy one.

## V.    Changes to Sentencing Guidelines

Weischedel's final argument in support of compassionate release is that

non-retroactive changes to Sentencing Guidelines support a reduced sentence.

Specifically, Weischedel points to §5H1.1 of the U.S. Sentencing Commission

Guidelines Manual. At the time Weischedel submitted her motion, that section

stated:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20s and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships.

USSG §5H1.1 (Nov. 2024). This language was not part of the Guidelines when

Weischedel was sentenced. Section 1B1.13(c) states that

> [i]f a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.

Weischedel argues that had the departure under §5H1.1 been available at the time

of sentencing, it would have applied to her case. That departure, she insists, would

have shifted her Guideline sentence to something less than life imprisonment.

Weischedel therefore claims that, pursuant to §1B1.13(c), the Court should

consider §5H1.1 when determining the extent of any reduction to her sentence.

In November 2025, after Weischedel's motion was filed, the Guidelines

were amended and §5H1.1 was removed entirely. Under the heading "Reason for

Amendment," the Sentencing Commission explains:

> This amendment is a result of the Commission's exploration of ways to simplify the guidelines and to reduce tension between 18 U.S.C. § 3553(a) and the Guidelines Manual. Specifically, the amendment removes one of the steps in the current three-step sentencing process, which requires courts to consider departures provided for within the Guidelines Manual. As amended, the Guidelines Manual now provides a two-step process whereby the sentencing court must first correctly calculate the applicable guideline range as the "starting point and initial benchmark" and then must determine an appropriate sentence upon consideration of all the factors set forth by Congress in 18 U.S.C. § 3553(a).

USSG, App'x C, Amend. 836, at 421 (Nov. 1, 2025) (citing *Gall v. United States*, 552 U.S. 38, 49–51 (2007)). However, the Commission clarified that striking departures from the Guidelines was meant to be "outcome neutral" and that the change "does not serve as a limit to the information courts may consider in imposing a sentence." Further,

> [i]t is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts, or any other relevant factors, to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a).

*Id.* at 423. Weischedel has argued that her youthfulness at the time of the offense coupled with adverse childhood experiences qualify her for a downward departure. That departure no longer exists. However, the Court is encouraged and empowered to nevertheless rely on facts that would have formed the basis for that departure. Weischedel's arguments regarding her youthfulness and adverse childhood experiences merit consideration. Such information is no justification for

26

her crimes, but does provide insight about the individual who committed the crimes. But ultimately, because these issues were considered at the time of sentencing, this amendment to the Guidelines by itself does not change the calculus.

## CONCLUSION

Our collective humanity in this case reflects the duality of how justice must be responsive to the harsh reality of murder but at the same time compassionate. In the past nearly thirty years, there have been meaningful changes to federal sentencing. Although there has been horrendous abuse of this individual at the hands of the government, she is not entitled to immediate release. Nonetheless, in consideration of the concerns for compassionate release as reflected in §1B1.13(b)(4)(A) and §1B1.13(b)(5), as well as the factors set forth in 18 U.S.C. § 3553(a), a reduction is warranted. Accordingly, Weischedel's sentence is reduced to a total sentence of 506 months of imprisonment, after which time she shall be subject to the statutory maximum period of supervised release. Following her release, Weischedel must comply with the Standard Conditions of release as well as the Special Conditions imposed at sentencing or as modified in the future.

Accordingly, IT IS ORDERED that:

(1)    Weischedel's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), (Doc. 121), is GRANTED IN PART and DENIED IN PART.

27

(2)    As of the date of this Order, Weischedel's custodial sentence is REDUCED to terms of 446 months of imprisonment on Counts I, II, III, to be served concurrently, and a term of 60 months of imprisonment on Count V, to be served consecutively to the concurrent terms imposed in Counts I, II, and III. Accordingly, Weischedel's total term of imprisonment is now 506 months.[1]

DATED this 28th day of January, 2026.

_____
Donald W. Molloy, District Judge
United States District Court

---

[1] This reduction assumes that Weischedel has completed her term of incarceration on Counts IV and VI. If not, this Order is to be interpreted to reduce her custodial sentences for Counts IV and VI to time served as of the date of this Order.